# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60467-1-II |
| Respondent, | |
| v. | |
| RAUL MALDONADO PIMENTEL, | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, P.J. – Raul Maldonado Pimentel appeals his convictions of two counts of indecent liberties with forcible compulsion – domestic violence and three counts of first degree child molestation – domestic violence, and his sentence. The convictions arose from the allegation that Pimentel sexually molested his young grandson EP.

Although ER 404(b) generally prohibits the admission of evidence of a defendant's prior bad acts, evidence of prior bad acts is admissible under ER 404(b) to prove a common plan. The State offered evidence from CL, Pimentel's stepdaughter, and RBP, Pimentel's son and EP's father, that Pimentel had sexually abused them when they were children. The trial court admitted CL's and RBP's testimony under ER 404(b) on the grounds that they showed a common plan.

After convicting Pimentel, the jury also found two aggravating factors for each charge. The sentencing court imposed an exceptional sentence above the standard range for all five of

the convictions based on the two aggravating factors after concluding that there were substantial and compelling reasons for imposing an exceptional sentence.

We hold that (1) the trial court did not abuse its discretion when it admitted CL's and RBP's testimony under ER 404(b) based on a determination that the evidence showed a common plan and its probative value outweighed the prejudicial effect; (2) the trial court erred when it admitted a detective's testimony that CL and RBP told him that Pimentel had abused them as children, but the error was harmless; (3) we cannot address whether the trial court erred in excluding Pimentel's wife's response to a question about whether CL and RBP had disclosed abuse to her because Pimentel failed to make an offer of proof to preserve the issue for appeal; and (4) the trial court's imposition of the exceptional sentence was not based on impermissible judicial fact-finding.[1]

Accordingly, we affirm Pimentel's convictions and sentence.

FACTS

*Background*

In 2021, EP told his mother, his father (RBP), and his aunt (CL) that his grandfather, Pimentel, had sexually touched him when he was a child between the ages four and eight. The family went to the Pasco Police Department. Detective Bill Wright was assigned as the lead detective for the case.

---

[1] Pimentel also argued in its briefing that Division Three of this court erred by not transferring this case to another division because George Fearing, a Division Three judge, was the judge who made the ER 404(b) ruling in the trial court. However, Division Three ultimately transferred this appeal to this court, rendering this issue moot.

The State charged Pimentel with two counts of first degree attempted child rape, two counts of indecent liberties with forcible compulsion, and three counts of first degree child molestation.

*First Jury Trial*

The first trial took place in April 2022. The State called six witnesses to testify, including EP. The State did not call either CL or RBP.

EP testified that, from the ages of four and eight years old, while his family was living with Pimentel, Pimentel sexually abused him. Pimentel would take EP into Pimentel's bedroom, close the door, and grab him and rub his shoulders. Pimentel would remove his clothes and would sometimes remove EP's clothes or ask EP to take his clothes off. EP testified that Pimentel touched his penis and his butt. Pimentel would masturbate EP, while Pimentel's penis was erect. Sometimes Pimentel would touch his own penis while touching EP.

EP told Pimentel to stop, but Pimentel refused. EP tried to get away from Pimentel, but Pimentel would grab his wrists and prevent him from getting away. EP had bruises from Pimentel holding his wrists while on the bed. Once EP bent over the bed and Pimentel put his erect penis on the outside of his butt. Pimentel tried to force EP to put his erect penis in his mouth, but EP would move his face away to avoid Pimentel's penis. Pimentel told EP not to tell anyone or say anything "or else." Rep. of Proc. (RP) at 130. The abuse occurred two or three times a week starting when EP was four years old until he was eight years old.

Pimentel testified in his defense and denied ever having sexual contact with EP. The trial resulted in a hung jury.

*ER 404(b) Motion and Hearing*

The State moved forward with a second trial. The State subsequently filed a motion to introduce evidence under ER 404(b) of Pimentel's prior sexual misconduct. The State sought to introduce testimony from CL and RBP that Pimentel abused them when they were children. The State argued that the testimony was admissible under ER 404(b) as evidence of a common scheme or plan carried out by Pimentel.

The trial court held a hearing on the ER 404(b) motion. The court heard testimony from CL and RBP and also considered EP's testimony from the first trial.

CL testified that, starting when she was around three years old and while they were living in Arizona, Pimentel would touch or grope her vagina every night in her bedroom. Pimentel would lay down with CL and touch her. Sometimes Pimentel would touch CL inappropriately while Pimentel drove her in the car.

CL testified that one day at school, she was pulled out of class and taken to the nurse's office by either the school nurse or counselors. Shortly after that, the family moved from Arizona to Texas. CL testified that, in addition to touching her, Pimentel made CL touch his erect penis, performed oral sex on CL, and forced CL to perform oral sex on him. Pimentel told CL not to tell anyone or bad things would happen to her and to the family. In Texas, CL again was pulled out of class and taken to the nurse's office. After that, the family moved to Mexico.

While in Mexico, Pimentel worked construction jobs that required him to travel for work. When he returned from work travel, Pimentel would rape CL. CL testified that she told her mother about the abuse when she was 12 years old. At one point, Pimentel brought out a gun and pointed it at himself. He said that he would shoot himself if anyone found out about what he did to CL.

When she was 14 years old, CL's grandmother died. CL and her family traveled from Mexico to Washington for the funeral. CL told her cousin what Pimentel had done to her, and she then moved in with her aunt in Arizona.

RBP testified that the family lived in Arizona when he was four or five years old. Pimentel began to inappropriately touch RBP while they were living in Arizona. Pimentel would touch RBP's penis and would put his penis on RBP. Sometimes RBP would try to get away and Pimentel would hit him. Pimentel told RBP to let him touch him and not to resist. Pimentel abused RBP in his bedroom and in public restrooms. After RBP's mother confronted Pimentel about sexually abusing CL, Pimentel pointed a gun to his head and told RBP, his mother, and CL that he would kill himself if they left him.

The State argued that evidence of other bad acts as proof of a common plan was relevant to prove that the charged act occurred, especially in cases where the defendant denies the alleged acts took place. The State highlighted the similarities between what happened to CL and RBP and to EP. Pimentel argued that the evidence was inadmissible under ER 404(b).

*Trial Court ER 404(b) Ruling*

The trial court issued a lengthy written ruling on the State's 404(b) motion. The court found that by a preponderance of the evidence, CL's and RBP's testimony established the facts of molestation and threats made by Pimentel. The court also identified the grounds on which the State sought to introduce the testimony under ER 404(b), which included showing a common plan.

The trial court next analyzed the relevance of the testimony. The court engaged in an extensive review – covering almost 12 pages – of the Washington cases in which evidence of a common plan was admitted under ER 404(b) in sex abuse cases.

The trial court noted that the State submitted a list of the similarities between Pimentel's abuse of EP and his conduct toward CL and RBP, and the court agreed with those similarities. The court concluded, "Based on those similarities, I find a common plan, scheme, or design." Clerk's Papers (CP) at 240. The court found that the facts in this case aligned with the other Washington cases that it had reviewed that allowed ER 404(b) evidence rather than with one case where the court excluded bad acts evidence, *State v. Slocum*, 183 Wn. App. 438, 333 P.3d 541 (2014). The court concluded that "[a] sufficient similarity bears relevance when the defendant denies the existence of the underlying acts." CP at 240.

Regarding the similarities, the trial court stated,

Raul Pimentel targeted children of his family. The children lived in his household. Pimentel assumed a position of trust and authority with each child. Pimentel generally performed the sex acts when alone with the child, when only other children were present, or in a closed public restroom. Each victim was approximately the same tender age when Pimentel began his molestation. The acts of sex grew more aggressive as time passed. Pimentel started with the touching of the child's genitals. He progressed to forcing the child to touch his erect penis. Pimentel either forced the child or attempted to force the child to suck his penis. The abuse with each child occurred over the course of many years. Pimentel told each child not to tell others and threatened the child with harm if he or she disclosed his behavior.

Raul Pimentel either expressly or implicitly contends that the alleged conduct on all three children, [RBP], [CL], and [EP] must be unique. But ER 404(b) refers to a "common scheme or plan," not unique behavior. Under the common understanding of a common scheme or plan, one can engage in such a scheme or plan without any unique behavior. Case law concludes that the State need not demonstrate a pattern of unique acts with each victim.

CP at 240.[2]

---

[2] The court excluded certain portions of CL's and RBP's testimony, including CL's testimony that Pimentel raped her and RBP's testimony that Pimentel placed a gun to his head while in Mexico when confronted with sexual abuse allegations.

Next, the trial court analyzed whether the probative value of the evidence outweighed the prejudicial effect. The court acknowledged that evidence must be excluded even if it is relevant if its probative value is substantially outweighed by the danger of unfair prejudice. The court noted that Washington cases recognize that the evidence of prior similar acts of sexual abuse is "very probative of a common scheme or plan in part because the need for such proof is unusually great in child sex abuse cases." CP at 243.

> The evidence is strongly probative because of the secrecy surrounding child sex abuse, victim vulnerability, the frequent absence of physical evidence of sexual abuse, the public opprobrium connected to such an accusation, a victim's unwillingness to testify, and a lack of confidence in a jury's ability to determine a child witness' credibility. Courts generally find substantial probative value in prior sexual abuse evidence when the only other evidence in the charged case is the child's testimony.

CP at 243 (citations omitted). And the court stated that "the courts attach more meaning to the need of the evidence than its closeness in proximity and nature to the current charge." CP at 243.

The trial court commented:

> I hold concern that, with the testimony of [CL] and [RBP] of other acts of child molestation, the jury will almost automatically convict [Pimentel] of molestation of EP. Nevertheless, no case suggests that I should necessarily exclude the evidence based on this concern. I should only consider this concern in my balancing process. Also, the jury may discount the testimony of [CL] and [RBP] as angry children attempting to retaliate against their father. The jury could agree that [RBP] convinced EP to help frame his grandfather for something Pimentel did not do.

CP at 244. The court concluded,

> After reviewing Washington cases, I find the probative value of the prior acts of molestation to outweigh their prejudicial effects. As argued by the State, EP was young when the abuse occurred and will be a young teenager when testifying. The jury may question the reliability of his testimony because of his age. No witness confirms the touching of EP. The State lacks physical evidence.

CP at 244-45.

The court noted that the first trial resulted in a hung jury but stated,

7

One might deem the fact of a hung jury with the first trial to be of help to Raul Pimentel. But case law is to the contrary. The result of a hung jury confirms the need for the evidence to counteract Raul Pimentel's contention that he never sexually touched EP.

CP at 245.

The trial court instructed the judge presiding over the trial to read a limiting instruction to the jury before the testimony of each witness to "inform the jury of the limited purpose behind [RBP's] and [CL's] testimony and that the testimony cannot be used to show that Raul Pimentel had a predisposition to molest children." CP at 245.

*Second Jury Trial*

The second trial took place with a different presiding judge. The State called seven witnesses. EP testified consistently with his first trial testimony, and CL and RBP testified consistently with their testimony at the ER 404(b) hearing.

Detective Wright testified about his interview with EP. He then testified about an interview with RBP:

Q. So following that interview [with EP] did you later interview [RBP]?

A. I did.

Q: And why did you conduct a separate interview with him?

A: During, the meeting with him after the Kids Haven interview with [EP], [RBP] disclosed to me.

[Pimentel]: Objection. Hearsay.

[Prosecutor]: . . . [T]his is not being offered for the truth of the matter asserted. It's being offered to show Detective Wright's process of interviewing, why he conducted an interview with other witnesses regarding different issues.

THE COURT: I'll overrule the objection but advise the jury that you are not allowed to consider what he's saying as far as what others told him to prove the truth of that. It's only being offered to show why this witness did what he did.

Q: OK. You may continue. So why did you conduct the interview with [EP's] father?

A: It was during the meeting with him after the [EP] interview he had indicated to me that he was also a victim of child sexual abuse by his father.

RP at 888-89.

Detective Wright next testified about an interview with CL:

Q: Now subsequent to that interview did you interview [CL]?

A: Afterwards, yes.

. . . .

Q: And why did you conduct a separate interview with her?

A: I had also learned –

[Pimentel]: Objection. Hearsay.

[Prosecutor]: Again, your Honor, same record.

THE COURT: And that'll be overruled. And again you're only to consider testimony from this witness regarding this as far as what was told to him by this individual for establishing why this witness did what he did, not for the truth of what the witness said.

A: I'd also learned that she was the victim of sexual abuse when she was a young [child] by the father.

RP at 889-90.

Pimentel's wife, Conchita,[3] also testified. During cross-examination, the following colloquy took place:

Q. Miss Pimentel, were you ever made aware when your two children [RBP] and [CL] were growing up that they believed that they were the victims of any kind of sexual assault by the defendant?

[Prosecutor]: Objection, your honor. Calls for state of mind of a third party.

---

[3] Because Pimentel and Conchita share the same last name, we will refer to Conchita by her first name only. No disrespect is intended.

9

THE COURT: Could I hear the question one more time?

[Pimentel]: I could rephrase it.

THE COURT: Say it again or rephrase it, and you can re-raise your objection.

Q: Did you ever observe any kind of sexual assault against [RBP] or [CL]?

A: No, I didn't.

Q. And were you ever told by them of any kind of assault of that nature?

[Prosecutor]: Objection, your Honor. Calls for hearsay.

THE COURT: Sustained.
. . . .

Q: Did you ever suspect your husband of sexually assaulting –

[Prosecutor]: Objection, your Honor.

Q. – your children?

THE COURT: Overruled.

Q. Did you ever suspect your husband of sexually assaulting your children?

A. (Shakes head.)

Q: And it was quiet, but that was a no?

A: No.
. . . .

Q: So you did not, you had no reason to believe for any reason that during that time period, or younger, or anytime [CL] was living at your home she was the victim of sexual assault by the defendant? Correct?

A: It was –
. . . .

Q: So at no time when your children were living with you from childhood to teenage years to the time they left your home, you had no reason to believe that they were victims of sexual assault by the defendant?

A: (Shakes head.)

Q: And that's not why [CL] left your home, is it?

A: Yes.

Q: OK.

A: Yes, it was. She left because of that.

RP at 944-47.

Pimentel testified in his defense. He denied the allegations that he had sexually abused EP. He claimed that "they want to get me out of the way." RP at 1008. Pimentel also believed that that EP was mad at him for refusing to buy EP a new cell phone, and that was why EP raised these allegations against him.

The jury returned guilty verdicts on two counts of indecent liberties with forcible compulsion and three counts of first degree child molestation. For each conviction the jury found that Pimentel and EP were members of the same household. And the jury found two aggravating factors on each charge – that Pimentel used his position of trust to facilitate the offenses and that the offenses exhibited an ongoing pattern of sexual abuse of a minor.

*Sentencing*

The trial court held a sentencing hearing. The standard range sentence for each conviction was 149-198 months to life. The trial court stated,

> [T]he Court would note that the jury on this matter, having heard the matter, specifically found that the aggravating factors that had been charged, including that the defendant abused position of trust in the commission of these offenses, as well as the defendant engaged in a pattern of sexual abuse were found by the jury as being true based on the evidence that was presented.
>
> And based on that, Court is allowed to deviate to some extent from what would otherwise be the standard range in this case.

RP (Dec. 2, 2022) at 143.

11

> Because of the fact that it's, again, because we have aggravators that were found, the Court is allowed, if found appropriate, to consider a sentence for the minimum, above the – what otherwise would be the top of the minimum range being 188 months.
>
> The Court would find that based on the finding of the aggravators here that it would be proper to go above the top of the standard range; otherwise, there wouldn't be any significance to those aggravators having been found.

RP (Dec. 2, 2022) at 144.

The trial court stated in the judgment and sentence that based on the aggravating factors found by the jury, it found substantial and compelling reasons that justify an exceptional sentence. The court sentenced Pimentel to 360 months to life each on the two indecent liberties with forcible compulsion – domestic violence convictions and the three first degree child molestation – domestic violence convictions.

Pimentel appeals his convictions and his sentence.

## ANALYSIS

A. ADMISSION OF ER 404(b) TESTIMONY

Pimentel argues that the trial court erred when it allowed the State to present CL's and RBP's testimony that Pimentel sexually abused them when they were children for purposes of showing a common plan under ER 404(b). We disagree.

### 1. ER 404(b) Framework

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, this evidence may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). The proponent of the evidence bears the burden of demonstrating its proper purpose. *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012).

12

One accepted "other purpose" under ER 404(b) is to show the existence of a common plan, where the defendant " 'devises a plan and uses it repeatedly to perpetrate separate but very similar crimes.' " *Id.* at 421-22 (quoting *State v. Lough*, 125 Wn.2d 847, 854-55, 889 P.2d 487 (1995)). Similarity of results is not sufficient. *Gresham*, 173 Wn.2d at 422. The prior misconduct and the charged crime must be "markedly and substantially similar." *Id.* The defendant must commit " 'markedly similar acts of misconduct against similar victims under similar circumstances.' " *State v. DeVincentis*, 150 Wn.2d 11, 19, 74 P.3d 119 (2003) (quoting *Lough*, 125 Wn.2d at 856). The prior misconduct and the charged crime must have such common features that the acts naturally can be explained as individual manifestations of a general plan. *Id.* But to be admissible to show a common plan, evidence of prior child sexual abuse must show more than a general "plan" to molest children. *State v. Slocum*, 183 Wn. App. 438, 453-54, 333 P.3d 541 (2014).

Whether a common plan exists focuses on "the *similarity* between the prior acts and the charged crime rather than the *uniqueness* of the individual acts." *DeVincentis*, 150 Wn.2d at 19. Demonstrating similarity "does not require that the evidence of common features show a unique method of committing the crime." *Id.* at 21.

"Evidence of . . . [a] common scheme or plan is admissible because it is not an effort to prove the *character* of the defendant. Instead, it is offered to show that the defendant has developed a plan and has again put that particular plan into action." *Gresham*, 173 Wn.2d at 422.

Before a trial court admits evidence under ER 404(b), it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the

probative value of the evidence against its prejudicial effect. *State v. Gunderson*, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014). The trial court must complete this analysis on the record. *Id.* And if evidence of a defendant's prior bad acts is admissible for a proper purpose, the defendant is entitled to an appropriate limiting instruction. *Gresham*, 173 Wn.2d at 423.

Under the third factor of the ER 404(b) analysis, the evidence must be relevant to prove an element of the charged crime. One such element is whether a criminal act occurred. *Lough*, 125 Wn.2d at 853 (the defendant's design or plan is admissible "[w]hen the very doing of the act charged is still to be proved"). "When the existence of the criminal act is at issue, evidence of substantially similar features between a prior act and the disputed act is relevant." *DeVincentis*, 150 Wn.2d at 20.

Washington courts have held in several cases under various factual scenarios that testimonial evidence of prior child sexual abuse committed by a defendant that is similar to the charged sexual abuse is admissible for the purpose of showing a common plan. *E.g., Gresham*, 173 Wn.2d at 421-22; *DeVincentis*, 150 Wn.2d at 22-24; *State v. Kennealy*, 151 Wn. App. 861, 887-89, 214 P.3d 200 (2009); *State v. Sexmith*, 138 Wn. App. 497, 505, 157 P.3d 901 (2007); *State v. Baker*, 89 Wn. App. 726, 733, 950 P.2d 486 (1997); *State v. Krause*, 82 Wn. App. 688, 697, 919 P.2d 123 (1996).

We must read ER 404(b) together with ER 403 when analyzing whether the prejudice unfairly outweighs the probative value of the evidence. *Gunderson*, 181 Wn.2d at 923.

> Even when ER 404(b) evidence is admitted for a proper purpose and is relevant to a material issue in the case, the trial court must still weigh the probative value against its prejudicial effect. Evidence of prior misconduct is likely to be highly prejudicial, and should be admitted only for a proper purpose and then only when its probative value clearly outweighs its prejudicial effect.

*Lough*, 125 Wn.2d at 862.

14

"The probative value outweighs the prejudice where: (1) the evidence is highly probative because it tends to show a common design or plan; (2) need for evidence is great given the nature of the allegations; and (3) the trial court gives the appropriate limiting instruction to the jury."

*State v. Griswold*, 98 Wn. App. 817, 827, 991 P.2d 657 (2000).

> Prior similar acts of sexual abuse are generally "very probative of a common scheme or plan," and the "need for such proof is unusually great in child sex abuse cases." The evidence is strongly probative because of the secrecy surrounding child sex abuse, victim vulnerability, the frequent absence of physical evidence of sexual abuse, the public opprobrium connected to such an accusation, a victim's unwillingness to testify, and a lack of confidence in a jury's ability to determine a child witness's credibility.

*Kennealy*, 151 Wn. App. at 890 (quoting *Krause*, 82 Wn. App. at 696).

The Supreme Court in *DeVincentis* approved of similar factors applied by the trial court in that case:

> [T]he age of the victim, the need for the evidence, the secrecy surrounding sex abuse offenses, "[t]he vulnerability of the victims, the absence of physical proof of the crime, degree of public opprobrium associated with the accusation, . . . [and the] general lack of confidence in the ability of a jury to assess the credibility of child witnesses."

150 Wn.2d at 23 (quoting Report of Proceedings at 130).

When the trial court correctly interprets ER 404(b), we review the trial court's decision to admit evidence under ER 404(b) for an abuse of discretion. *Gunderson*, 181 Wn.2d at 922. This abuse of discretion standard applies both to the determination of relevancy and the weighing of probative value and prejudicial effect. *Gresham*, 173 Wn.2d at 422. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Gunderson*, 181 Wn.2d at 922.

2.  Analysis

a.  Standard of Review

Here, the trial court applied the proper ER 404(b) analysis in determining the admissibility of the testimony of CL and RBP. First, the court found by a preponderance of the evidence that the testimony was true, noting "the lack of any countervailing testimony, the demeanor and confidence of the witnesses, and the consistency between the two witnesses' stories." CP at 227. Second, the court found that the State sought to introduce the testimony of CL and RBP for proper reasons under ER 404(b): to show a common plan or scheme. Third, the court engaged in an extensive analysis of case law to determine whether CL's and RBP's testimony was relevant. Fourth, the trial court weighed the probative value against the prejudicial value of the testimony. Finally, the court instructed the judge presiding over the trial to give limiting instructions to the jury before CL and RBP testified.

Because the trial court did not err when it interpreted ER 404(b), we review for abuse of discretion the court's ruling that certain portions of CL's and RBP's testimony was admissible. *Gunderson*, 181 Wn.2d at 922. And we review for abuse of discretion the court's specific decisions regarding relevancy and the weighing of probative value and prejudicial effect. *Gresham*, 173 Wn.2d at 422.

b.  Existence of Common Plan

Pimentel argues that the trial court erred in determining that CL's and RBP's testimony combined with EP's testimony established a common plan that was relevant to the charges against him. We disagree.

The trial court identified multiple similarities between the sexual abuse of CL and RBP and the sexual abuse of EP:

[1] Raul Pimentel targeted children of his family. [2] The children lived in his household. [3] Pimentel assumed a position of trust and authority with each child. [4] Pimentel generally performed the sex acts when alone with the child, when only other children were present, or in a closed public restroom. [5] Each victim was approximately the same tender age when Pimentel began his molestation. [6] The acts of sex grew more aggressive as time passed. Pimentel started with the touching of the child's genitals. He progressed to forcing the child to touch his erect penis. [7] Pimentel either forced the child or attempted to force the child to suck his penis. [8] The abuse with each child occurred over the course of many years. [9] Pimentel told each child not to tell others and threatened the child with harm if he or she disclosed his behavior.

CP at 240. We conclude that these characteristics showed " 'markedly similar acts of misconduct against similar victims under similar circumstances.' " *DeVincentis*, 150 Wn.2d at 19 (quoting *Lough*, 125 Wn.2d at 856).

Pimentel raises several arguments to argue that CL's and RBP's testimony was not relevant other than to show propensity. First, he claims that CL's and RBP's testimony was not similar to EP's allegations because CL said that Pimentel actually raped her and RBP claimed that Pimentel sometimes abused him in public restrooms. EP's allegations did not involve those activities. But the trial court excluded CL's testimony that Pimentel raped her. And the fact that Pimentel raped CL and occasionally molested RBP in a public bathroom does not render their testimony irrelevant because Pimentel's acts need not be unique to each victim. *Gresham*, 173 Wn.2d at 422.

Second, Pimentel highlights the fact that decades separated the allegations of CL and RBP and those of EP. He emphasizes that the acts involving CL and RBP were isolated incidents that happened 50 years before the alleged acts involving EP. The Supreme Court addressed this issue in *Lough*. The court agreed with a Minnesota court that "while passage of time may in some cases be a factor, the passage of a number of years may be without real significance if the older offense is part of a 'pattern' of similar misconduct occurring over a

number of years." *Lough*, 125 Wn.2d at 858. The court also agreed with a North Carolina court that "while the lapse of time between instances may slowly erode the commonality between acts, when similar acts have been performed repeatedly over a period of years, the passage of time serves to prove, rather than disprove, the existence of a plan." *Id.* at 860.

Here, there were strong similarities between the much older acts and the current alleged acts. As a result, under *Lough* the passage of time is not determinative. 125 Wn.2d at 858, 860. And Pimentel cites no authority to support the proposition that evidence of prior misconduct that is 40 or 50 years old is irrelevant when it demonstrates a common plan.

Third, Pimentel argues that the similarities between the acts involving CL and RBP and the alleged acts involving EP merely showed a general plan to molest children. He relies on the statements in *Slocum* that a general plan to molest children is not the type of plan that allows the admission of prior bad acts under ER 404(b). 183 Wn. App. at 442, 453. However, the State does not argue and the trial court did not find that Pimentel had a general plan to molest children. Here, there are a number of substantial similarities between the prior acts and the current alleged act that show a common plan beyond just to molest children.

Fourth, Pimentel argues that even if the evidence established a common plan, it was not relevant to prove an element of the offenses. But here, Pimentel denied EP's allegations of abuse. Therefore, an element of the crime was that Pimentel actually committed the acts constituting indecent liberties and molestation. The defendant's design or plan is admissible "[w]hen the very doing of the act charged is still to be proved." *Lough*, 125 Wn.2d at 853; *see also DeVincentis*, 150 Wn.2d at 20. And when the defendant denies the allegations, evidence of a plan or scheme or design is relevant. *Krause*, 82 Wn. App. at 695.

Fifth, Pimentel challenges the State's argument in the trial court that the evidence showed a "compulsion" to molest children. We agree that a compulsion to molest children is similar to a general plan to molest children and cannot support admissibility. However, the trial court did not rely on this argument.

Finally, Pimentel quotes from a New Mexico case *State v. Gallegos,* 141 N.M. 185, 194-95, 152 P.3d 828 (2007), which criticized our Supreme Court's decisions regarding ER 404(b) evidence. But that case obviously is not controlling in Washington.

We conclude that the trial court did not abuse its discretion in ruling that the testimony of CL and RBP combined with EP's testimony showed a common plan that was relevant to the charges against Pimentel.

###### c. Probative Value and Prejudicial Effect

Pimentel argues that the trial court erred in determining that the prejudicial effect of CL's and RBP's testimony outweighed the probative value of the evidence. We disagree.

Evidence of a defendant's prior acts of sexual misconduct, standing alone, is probative only to show propensity to commit such acts. However, when those prior acts reflect a common scheme or plan, such evidence becomes highly probative. "[E]vidence that a charged crime was carried out in a manner devised by the defendant and used by him more than once has a distinct and additional probative value [other than showing propensity] that justifies its admission." *Slocum*, 183 Wn. App. at 456.

This probative value is enhanced in cases involving child sexual abuse, where the need for supporting evidence is great because corroborating evidence generally is unavailable. *See DeVincentis*, 150 Wn.2d at 23; *Kennealy*, 151 Wn. App. at 890.

19

Here, the trial court relied on the factors in *DeVincentis* and *Kennealy* outlined above to determine probative value, including:

> the secrecy surrounding child sex abuse, victim vulnerability, the frequent absence of physical evidence of sexual abuse, the public opprobrium connected to such an accusation, a victim's unwillingness to testify, and a lack of confidence in a jury's ability to determine a child witness's credibility.

*Kennealy*, 151 Wn. App. at 890. We agree with the trial court that CL's and RBP's testimony had high probative value.

Pimentel points to the trial court's acknowledgement that the admission of CL's and RBP's testimony almost certainly would lead to his conviction to show that the evidence was overly prejudicial. There is no question that the prior acts evidence was prejudicial. But the trial court also recognized that the jury could discount CL's and RBP's testimony as angry children retaliating against their father or believe that RBP convinced EP to help frame Pimentel. In addition, the trial court instructed the judge presiding over the trial to read a limiting instruction to the jury before the testimony of each witness to "inform the jury of the limited purpose behind [RBP's] and [CL's] testimony and that the testimony cannot be used to show that Raul Pimentel had a predisposition to molest children." CP at 245.

ER 404(b) requires a balancing, and the trial court in the exercise of its discretion determined that the high probative value of CL's and RBP's testimony outweighed the obvious prejudicial effect. We conclude that the trial court did not abuse its discretion in ruling that the probative value of CL's and RBP's testimony outweighed the prejudicial effect of that evidence.

3. Summary

The standard of review is abuse of discretion. *Gresham*, 173 Wn.2d at 422. We conclude that the trial court did not abuse its discretion in ruling that CL's and RBP's testimony showed that a common scheme or plan existed and that the probative value of the evidence

outweighed its prejudicial effect. Accordingly, we hold that the trial court did not err when it admitted the testimony from CL and RBP under ER 404(b).

B. EVIDENCE RULINGS

Pimentel argues that the trial court erred when it (1) admitted Wright's testimony that CL and RBP told him that Pimentel had abused them as children and (2) excluded testimony from Conchita about whether CL and RBP had reported abuse to her. We agree with the first argument but conclude that the error was harmless. We decline to address the second argument.

1. Legal Principles

Hearsay is an out of court statement offered for the truth of the matter asserted. ER 801(c). Hearsay evidence is not admissible unless a hearsay exception applies. ER 802. However, statements are not hearsay if they are not offered to prove the truth of the matter asserted. *State v. Chambers*, 134 Wn. App. 853, 859, 142 P.3d 668 (2006). We review de novo whether a statement constitutes hearsay. *State v. Carte*, 27 Wn. App. 2d 861, 877-78, 534 P.3d 378 (2023), *review denied*, 2 Wn.3d 1017 (2024).

Erroneous admission of evidence is harmless unless there is a reasonable probability that, but for the error, the verdict would have been materially different. *State v. Ashley*, 186 Wn.2d 32, 47, 375 P.3d 673 (2016).

2. Admission of Detective Wright's Testimony

Wright was the detective assigned to the case. The State asked Wright if he had interviewed RBP and CL in addition to interviewing EP. Pimentel objected, claiming that the questions called for hearsay. The State argued that the testimony was not being offered for the truth of the matter asserted, but rather to show why Wright interviewed RBP. The trial court overruled Pimentel's hearsay objections and advised the jury to consider the testimony only to

the extent that it showed why Wright interviewed RBP and CL. Wright then said that he interviewed RBP and CL because they told him that Pimentel had abused them when they were children.

We conclude that the trial court erred in allowing Wright's testimony. The questions about RBP and CL may have been for the purpose of showing why Wright interviewed them. But why he interviewed them was completely irrelevant other than to show that they disclosed sexual abuse by Pimentel. Therefore, the actual reason for asking the questions was to introduce inadmissible hearsay. *See State v. Rocha*, 21 Wn. App. 2d 26, 504 P.3d 223 (2022) (error to admit evidence to explain why law enforcement officers went to a gas station, where the defendant and his father had an argument, when the only relevance of the argument was to prove that the son had a motive to commit the charged crime).

But we also conclude that the error was harmless. Both RBP and CL testified during trial about being abused by Pimentel when they were children. And they were subject to cross-examination by Pimentel. There is no reason to believe that the admission of Wright's brief testimony that RBP and CL told him that they had been abused affected the verdict.

We hold that the trial court's error in admitting Wright's testimony was harmless.

2.  Exclusion of Conchita's Testimony

During cross-examination, Pimentel asked Conchita if her children had ever told her that Pimentel had sexually assaulted them. The trial court sustained the State's hearsay objection. Pimentel did not make an offer of proof regarding Conchita's expected answer.

Conchita's answer would have been hearsay if her answer was "yes," but not if her answer was "no." Pimentel acknowledges that it is possible that Conchita would have answered "yes." And in fact, after denying that she suspected that CL was a victim of sexual assault,

Conchita testified that CL left the family home because of Pimentel's sexual abuse. Therefore, we cannot know for sure how Conchita would have answered the cross-examination question because Pimentel did not make an offer of proof.

To obtain appellate review of the exclusion of evidence, a party must have provided an offer of proof in the trial court. *State v. Wang*, 5 Wn. App. 2d 12, 26, 424 P.3d 1251 (2018). The offer of proof should "inform the trial court of the specific nature of the offered evidence so the court can judge its admissibility." *State v. Burnam*, 4 Wn. App. 2d 368, 377, 421 P.3d 977 (2018).

In the trial court, Pimentel failed to identify what Conchita's expected answer may have been. Without such an offer of proof, we cannot review whether the court properly excluded Conchita's testimony. Therefore, we decline to address this argument.

C.    CONSTITUTIONALITY OF EXCEPTIONAL SENTENCE

Pimentel argues that the trial court's imposition of an exceptional sentence was based on judicial fact-finding, which violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution. We disagree.

1.    Legal Principles

Under RCW 9.94A.535 and RCW 9.94A.537, a trial court may impose an exceptional sentence if it finds there are "substantial and compelling reasons justifying an exceptional sentence," provided that the aggravating factors have been found by a jury beyond a reasonable doubt. Specifically, RCW 9.94A.535(3) permits an exceptional sentence if the jury finds the defendant (1) used a position of trust to facilitate the offense, RCW 9.94A.535(3)(n), and (2) "[t]he offense was part of an ongoing pattern of sexual abuse of the same victim under the age of eighteen years manifested by multiple incidents over a prolonged period of time." RCW

9.94A.535(3)(g). The jury must determine the existence of the aggravating factors, but the trial court then determines whether those factors warrant an exceptional sentence. *State v. Suleiman*, 158 Wn.2d 280, 290-291, 143 P.3d 795 (2006).

The Sixth and Fourteenth Amendments guarantee a defendant the right to a jury trial for every fact that increases the penalty for a crime beyond the statutory minimum. *Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). " 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " *Id*. (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)).

However, Division One of this court in *State v. Sage* held that determinations involving application of the law to facts already found by the jury are legal conclusions, not factual findings, and do not require additional jury consideration. 1 Wn. App. 2d 685 708-10, 407 P.3d 359 (2017). The court stated,

> Washington cases recognize that once the jury by special verdict makes the factual determination whether aggravating circumstances have been proved beyond a reasonable doubt, "[t]he trial court [is] left only with the legal conclusion of whether the facts alleged and found were sufficiently substantial and compelling to warrant an exceptional sentence."

*Id*. at 708 (alterations in original) (quoting *Suleiman*, 158 Wn.2d at 290-91).

Washington courts have emphasized that the judicial role in determining whether a sentence is justified under RCW 9.94A.535 involves applying the law to facts already found by the jury. This approach does not violate constitutional protections. *Suleiman*, 158 Wn.2d 290-91; *Sage*, 1 Wn. App. 2d at 708-10; *State v. Johnson*, 29 Wn. App. 2d 401, 424-26, 540 P.3d 831, *review denied*, 2 Wn.3d 1035 (2024).

2.    Analysis

Pimentel challenges the trial court's determination that the jury's findings provided substantial and compelling reasons for an exceptional sentence, arguing that this amounted to impermissible judicial fact-finding in violation of his constitutional rights. He relies on *Hurst v. Florida*, 577 U.S. 92, 97-98, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), to argue that any determination leading to an increased sentence should have been submitted to the jury.

In *Hurst*, the Supreme Court addressed Florida's death penalty sentencing scheme for capital felonies, in which the jury provided a recommendation of a life or death sentence without stating the factual basis of its recommendation. *Id*. at 95-96. Although the trial court would consider the jury's recommendation, the court exercised independent judgment to determine whether a death sentence was justified. *Id*. The Court held that Florida's death penalty sentencing scheme was unconstitutional because it allowed judges, rather than juries, to independently determine the existence of aggravating circumstances necessary to impose a death sentence. *Id*. at 98-100.

However, Washington's sentencing scheme is distinguishable. Unlike Florida's law, which required judges to find aggravating factors and weigh them against mitigation, Washington requires a jury to find the existence of aggravating factors beyond a reasonable doubt before a court can consider whether those factors are substantial and compelling. RCW 9.94A.535; RCW 9.94A.537(6). The trial court has no role in the jury's determination. Only once the jury has made its factual findings can the trial court determine as a matter of law that those findings justify an exceptional sentence. *See Sage*, 1 Wn. App. 2d at 708-09.

Pimentel also argues that *Sage* was wrongly decided. We disagree. *Sage* relied on and quoted from our Supreme Court's decision in *Suleiman*, 158 Wn.2d at 290-91 & 291 n.3. *Sage*,

25

1 Wn. App. 2d at 708 & n.80. And our Supreme Court denied review in *Sage*. 191 Wn.2d 1007 (2018).

Here, the trial court complied with constitutional and statutory requirements. The jury found the existence of two aggravating factors beyond a reasonable doubt. The trial court concluded that these findings constituted "substantial and compelling reasons" to impose an exceptional sentence, as required by RCW 9.94A.535 and RCW 9.94A.537(6). This determination was a legal conclusion rather than a factual determination and therefore appropriately was made by the court. *Sage*, 1 Wn. App. 2d at 708.

We hold that the trial court's imposition of an exceptional sentence did not violate Pimentel's constitutional rights.

CONCLUSION

We affirm Pimentel's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

GLASGOW, J.

PRICE, J.